The case today is No. 251384, Svetlana Doe et al. v. Christie Noem et al. At this time, would counsel for the appellants please come to the podium and introduce himself on the record to begin? Good afternoon. May it please the court, Drew Ensign, Deputy Assistant Attorney General for the United States. I'd like to reserve four minutes for rebuttal. Okay. Four minutes for rebuttal. And before you begin your argument, this is a question I'll just pose it. I just want to get this straight at the outset. This case is purely a statutory construction case. I don't see any due process challenge to the statute or its application. So I just want to get that when both sides argue, just let me know your thoughts about that just to be everybody be on the same boat. You may proceed. Thank you, Your Honor. And we agree there are no constitutional or due process challenges being presented here. As the Supreme Court is already implicitly recognized by a lopsided vote, the government is likely to prevail on appeal, either in this court or if necessary, in the Supreme Court. This court should reject plaintiff's brazen request to defy the Supreme Court by following their exhortation, quote, not to assign meaning, end quote, to its stay decision. Instead, this court should follow the Supreme Court's lead in reverse. This case should be given. We don't know. You say that the Supreme Court relied on the merits? Your Honor, certainly in order to grant a stay under their own standards, they would have had to conclude that the government was likely to prevail on appeal. And so that was an implicit determination that obviously is not conclusive. And so proceedings obviously are ongoing. But certainly as part of the analysis the Supreme Court did in order to grant a stay, it necessarily concluded that the government was likely to prevail on appeal here. We should give that, perhaps not automatic controlling weight, but we should give it deference and weight. Yes, Your Honor, we believe so. And so we believe this case should begin and end with justiciability, which is barred here for at least two reasons. First, Congress has explicitly barred judicial review of, quote, any decision or action, the authority for which is specified to be in the discretion of the Secretary of Homeland Security, end quote. That jurisdictional bar applies based on the nature of the authority at issue rather than how it was exercised. And the nature of parole is incontestably discretionary. Review is therefore barred under that first provision. Second, and more generally, the Secretary's exercise of authority to terminate parole is plainly committed to agency discretion and thus not subject judicial review under the APA. Congress explicitly provided that parole termination decisions are to be... Let me ask you in terms of your APA argument, do you see any situation in which the INA would permit judicial review but the APA would not? I don't believe so, Your Honor. All the review here is being brought through the APA, so the APA's barring of judicial review for things committed to agency discretion. That is the plaintiff's cause of action. That's what supplies judicial review here. It's true the INA does have other review provisions, but those are more typically coming up from petitions for review. Those are often channeled directly to the Court of Appeals. Plaintiffs have not attempted to invoke any sort of cause of action under Title VIII. I don't believe any such ones would exist here. Instead, they've invoked the jurisdiction of the district court under the APA, and therefore the APA's limitation on review to actions that are committed to agency discretion applies. How would this case be distinguishable to regents of the University of California? Because in that case, it was an APA case and there was jurisdiction. It was an APA case, and there were actually two different aspects of docket issue in regents. There was the general non-enforcement policy, which was discretionary, and the court recognized that was not reviewable. There was a separate attempt to grant status that was not discretionary. It was a creation wholly of the executive branch, and that separate creation of a never-before-seen immigration status with positive rights to benefits was something that the Supreme Court thought was reviewable. You would distinguish parole because it had existed. It's not a new status. Would that be your... That's correct. Parole, by its very nature, is discretionary and one that this court has recognized as much. It's a highly discretionary statute. Even before you get to the fact that it is, as determinations, it is reserved to the mere opinion of the secretary rather than some objective standard. Particularly where, as the Supreme Court recognized in Webster, there is no meaningful review when you essentially have to cross-examine there the director of the CIA as to what his actual beliefs were. There's no meaningful law to apply there, and that's why the APA's committed agency discretion bar applied in Webster and why it applies here as well as in the Supreme Court decision in Bualfa, which also supports it. I'll note, too, that the district court's analysis in page 26 of the appendix simply the key issue here, which is she used ellipses to ellipses out the opinion of the secretary language, which is the crucial factor here that makes it just like what the CIA director deems and what the secretary of DHS deems in Webster and Bualfa, respectively. And so... Can I focus in on your argument that is at the beginning of your brief that the INA deprives the district court of jurisdiction? Absolutely, your honor. I didn't see a lot of case law cited there, and I'm wondering what your best case is for that. Your honor, I don't... I will acknowledge that there is not much case law either way on this. I think our best case law is the Samira case out of the Seventh Circuit and the Hassam case out of the Ninth Circuit, which recognizes clearly the discretionary nature of parole decisions. I think going by the text of the statute itself makes very clear that it's discretionary. I think, too, a key part of the INA's text there is that it doesn't say that the individual decision must be discretionary in order to trigger the bar. It says it turns on the nature of the authority, and the nature of the authority of parole is widely recognized to be discretionary. I believe this court did so, too, recognize as much in a case of not... Let me make sure I understand the breadth of your jurisdictional argument. Suppose the statute said that the secretary, in her discretion, can withdraw parole only after interviewing the parolee and determining X, and the secretary then said, in my discretion, I'm going to revoke parole, but without any interview. Would that be something that a court could say, you've exceeded the scope of your authority as opposed to misapplied your authority, therefore we have jurisdiction to review it? Your Honor, I think that likely would not be reviewable. I'll certainly acknowledge that would be a harder case than this one. You said that would not be reviewable? I believe so, Your Honor. I think that when Congress has an explicit bar judicial review, that necessarily means that some cases that might otherwise be meritorious will not be reviewable. But isn't there a distinction? It's not just that the case is meritorious. When Congress passes a statute, it grants the secretary certain authority. It then says, when the secretary exercises that authority, we can't second guess it. But it's a wholly different thing if the secretary exercises authority beyond that given by the statute. Then don't courts routinely review such exercises? I don't believe so, Your Honor. I do think the case would be very different as to the committed to agency discretion bar because in your hypothetical, now you do have law to apply. You have an interview standard that would be something that a court can supervise rather than just the mere opinion of the secretary. It's also conceivable. You could think that reading the bar in light of that specific statutory provision would reach a different result. But I think the point of the statute as written is that if it's a discretionary decision, and ultimately these are still discretionary decisions, that judicial review would be barred. In particular, I think that if a bar on discretionary action turns on, if its applicability turns on how that discretion was exercised, that's no bar at all. If you have to reach the merits in order to determine whether the jurisdictional bar applies, then that bar isn't really a bar. It's just a nullity that does no work. So then when Congress here said that you could establish a parole policy, admit someone only on a case-by-case basis, your logic would seem to say that even if the secretary did not do it on a case-by-case basis, that would be unreviewable. Your Honor, I think that is an accurate statement until about a couple months ago. Because perhaps recognizing that very scenario, Congress enacted the Lake and Riley Act, which specifically makes reviewable the grants parole where they violate the statute. And it provides for standing with states. I believe they have to have financial harm that exceeds $100. You would say it was unreviewable before that statute was passed. That would be your logic. Yes, Your Honor. In fact, that comports with basic principles of statutory interpretation that Congress doesn't enact nullities. That amendment was meant to do work. And it does work by providing for a review that would not otherwise exist. Do you read the statute as requiring – let me ask this. What do you regard as the purpose of the parole in this situation? Your Honor, it could be many purposes. It's because the granting of parole is in the discretion of the secretary. I think that any purposes that the secretary deemed relevant in order to make that determination are things that she could consider when terminating it. I think that's underscored, too, by making terminations turn on the opinion of the secretary. There's no restrictions on what the secretary might have opinions as to what good public policy is. And so, again, I don't think there's law to apply there. And I also don't think there's any restrictions necessarily on what could be considered in there. So, if we put to one side the jurisdictional issues and go to the merits, didn't the secretary here, at a minimum, have to determine that some purpose of the parole had been served? Your Honor, I don't believe that's reviewable. But setting aside the reviewability decision, I believe that as long as she concluded in her opinion that that was the case, then the statutory requirements have been met here. And so, what purpose was determined to have been served in this instance? There were many purposes that were determined to be served. For example, she pointed that the prior categorical grants of parole or categorical programs were designed to try to ease stress at the border and to try to regularize or provide some order to a very chaotic situation. Secretary Nome determined that that prediction was not, in fact, correct, that it was not having the public policy benefits that the prior administration anticipated they would. And she provided that as one of a plethora of reasons why she was terminating these programs. Let me ask, when the secretary gave her reasons, you understand they're distinguishable from the reasons the then secretary gave in the Regents of the University of California case, which were not enough? Yes, Your Honor. I mean, certainly, the key holding of the Regents case was that the secretary failed to give sufficient weight to the reliance interests of the DACA recipients in that Regents case. The secretary here did consider reliance interests, and I don't believe the district court found any fault whatsoever with how the secretary, Nome, analyzed those reliance interests. Let me ask a practical question. What is happening now? Your Honor, it is, after the Supreme Court's stay, it has been restored to where the secretary and authorities often delegated to line officers can make case-by-case determinations whether or not to grant parole or to not terminate them. The effect of the stay of the 705 stay is to restore the prior status quo of the rule where that can be done on a case-by-case basis, but absent some case-by-case circumstance that those parole determinations have to be restored. Let me just follow up on that. Do you have any information or general terms or statistically as to since the Supreme Court's ruling, if any individuals have in fact on a case-by-case basis continued to have parole out of these four groups of individuals from these four countries? Your Honor, not specifically. I know that there are separate programs that are not currently on appeal here that the district court entered a stay of as well. As a result of that stay, I know that... Does this pertain to the new appeal that was filed? Yes, Your Honor. I know there have been thousands and thousands of such applications considered leading to many individual grants. I know certainly for that one, there are being considered. I know there are the case-by-case example continues to exist after the Supreme Court's stay. I don't have specific statistics. Would it be possible, let's say maybe by Friday, in Rule 28J letter to tell us if in fact any individuals have gotten parole after the Supreme Court order? Sure, Your Honor. Okay, so if you could do that by Friday, we'd appreciate that. But otherwise, your answer is from the humanitarian parole for the four countries here, the people who had that parole, that has now been terminated for them? It has. As a general matter, there may have been instances where the case-by-case exception was invoked or that that hasn't breached a determination yet. Okay, that's what I... For the Rule 28J letter, if you could let us know. Does the new notice of appeal affect anything we do here? I don't believe so, Your Honor. Okay, and sort of a different question. In the past, when parole has ended, have the humanitarian parolees been subject to expedited removal? Your Honor, my understanding is that they have previously. I don't know with the programs, but expedited removal has been applied previously to those whose parole has been terminated, and I believe that's consistent with the regulations. How have the... In terms of the programs themselves, how have those ended? Your Honor, I can't think of a specific example off the top of my head. I know that there have been... There certainly are many instances where parole is granted and then ultimately terminated, and that may be based on individualized circumstances. It may be on broader ones. I think that's important, particularly why terminations are often done on a broad basis. If, for example, you were to grant parole because there's a civil war going on in a country and the civil war ends, you would naturally think that you might want to address that as a sort of... Yeah, so I guess that's my question to you. In the past, if you know, how has that been addressed, or has it been that the parole has just been permitted to elapse? Your Honor, I'm not sure specifically. I mean, it would depend on how long those programs lasted. It would have to be two years unless there was some sort of interruption in the continuous presence requirements. I know that's not on the record here. I don't know off the top of my head how that's operated. Let's turn to your argument about has been paroled, which I think I understand you to mean your interpretation of that language from the expedited removal statute is that parole is an ongoing status. That's correct, Your Honor. I think there's an important antecedent point, which is that that is only one of a plethora of rationales given by the Secretary. And so we think those others provide a fully sufficient basis to support that. But in terms of... Are you conceding that point then? No, I'm not, Your Honor. I'm just pointing out that even if they were correct about it, it still can't form the basis of an affirmance. But we do contest that, and I see my time has expired. If you don't mind, if I continue. Please continue answering that. I think we may have some other questions. I appreciate that, Your Honor. The plaintiffs will also get any additional time that you get, so it'll be equal for both. Of course. I don't believe so for several reasons. The first is we pointed out the text of the expedited removal statute uses the past perfect tense, and the past perfect tense is used to indicate something that may have previously been the case, but is no longer the case. And so the use of the past tense rather than... Sorry, past. The pre-perfect tense rather than the mere past tense. If it said had been or was granted parole, we think that plaintiffs would have a much stronger argument. But had been paroled is different, particularly under the Turner cases we've cited. I think there's two other important textual parts of the parole statute itself, which indicates that expedited removal is appropriate for those whose parole has been terminated. The first is that the statute says, following a termination, the person, quote, shall forthwith return or be returned to the custody from which he was paroled, end quote. And so that's a clear indication that you should return to the status before the grant of parole. And that's underscored by the second and even more important language that, quote, thereafter his case shall continue to be dealt with in the same manner as any other applicant for admission to the United States, end quote. Applicants for admission are who expedited removal are applied to. That is a clear indication as to what Congress had in mind. Those that are not applicants for admission cannot be subject to expedited removal. Those are the category to which they apply. To be clear, it's not all applicants for admission that can be expedited removal, but applicants for admission are the entire universe of people to whom expedited removal can be applied. Let me ask a different question in a different area. When you look at the statute itself, had this been a criminal statute, perhaps the rule of lenity would be applied, but I have not found any Supreme Court cases, and I think at least our circuit cases, don't apply the rule of lenity to immigration cases. What's the government's position as to that if we were to read the statute? Your Honor, we certainly don't think the rule of lenity applies. That is a purely criminal context. Immigration is civil. I'm not aware of any application of the rule of lenity to immigration cases. I don't think it applies there, and I'm not aware of any sort of parallel construction that might apply in the immigration context. To the extent that canons apply in the immigration context, they often recognize the very substantial deference owed to the executive in enforcing and construing immigration laws. Let me follow up on that. In interpreting or reading the statute, we go to the Russello case, I believe it's pronounced that way, and there is some case law from our circuit suggesting that when you have a statute, it doesn't have these separate sections. It could be the same section, different parts of the statute. For example, here at the beginning it says case by case, and then it's omitted. Further on, it doesn't go case by case. Would you agree or disagree that our case law and the Russello case would warrant that the individual case by case requirement not apply to the termination of parole? Your Honor, let me address the canon, and then I think maybe you can address more broadly. I'm not sure exactly which bucket you would put it in. I think it's either the Russello presumption or the Expresso Unias canon, where you specify that grants must be made case by case and then have silence as determinations. I think that's probably the Expresso Unias canon. You could also see it as the Russello presumption because you put it in one place but you didn't put it in another. I think those operate kind of in tandem and serve complementary purposes. They both kind of explore the same basic intent that Congress has explored here, which I think is also conveyed by the text itself. I think there's a couple other key indications, too, that underscore that that's the correct interpretation of the statute here. I think history, context, case law, and the nature of the action are helpful. So if I can, let me just unpack those. I think the history is important here, particularly the 1996 IAIRA amendments. You know, plaintiff's argument, which the district court accepted, was that the use of the singular in the statute compels individual determinations. But if that were correct, the singular has existed previously, and in 1996, Congress made a point of inserting that case-by-case language for grants and parole. Under plaintiff's interpretation, that was a complete nullity, that it was completely superfluous, that it did nothing that didn't already exist that Congress hadn't already required by the use of the singular. I think context is important, too. We've cited other examples in Title VIII that make clear that when Congress wants individualized determinations, it is expressly mandated as much, including for grants. I think this court has case law, as well as the Supreme Court, that make clear that a clear statement is required to divest agencies of their discretion to act in broad categorical manners. I think the Supreme Court's case in Lopez does so, as well as this court's case in Muniz. I think the nature of this authority, as well, really lends itself to categorical resolution. As an example I brought up earlier, if parole is being granted because a civil war is then ongoing, when the civil war ends, you might expect that the agency would quite reasonably act in a categorical manner to say that the parole is no longer served. I think another categorical... Let me ask you, in the case, for example, of a civil war, if the civil war ends, there's a government, great relations to the United States, would there be any reason to then return each individually, but after hearing case by case, or that's probably your best example for doing it and must, right? We certainly think it's a very good example. I think there's another example presented by this case here, as well, that these programs were created on a categorical basis that the parole programs would alleviate pressures at the border and help improve our overall immigration system. That was a very categorical rationale of Secretary Mayorkas, and one in which that Secretary Noem just profoundly disagrees with. Because she believes that that prior categorical rationale no longer applies, it makes sense to unwind those parole grants that were done on a very categorical basis. Let me ask you one more practical question. As I understand it, the district court's preliminary injunction is going to be stayed, no matter what we do, for this appeal, for some substantial period of time, until the cert petition is ... time is gone, or the cert petition's been adjudicated. What's going to be ... Is there going to be anything left at that point? Your Honor, this hasn't been briefed. It's something that I started to give some thought to during moot arguments. I think the answer is that much of the practical significance of the case will be drained, but there will be enough collateral consequences that persist to avoid formal mootness. I think there will be, for example, aliens that might be put in expedited removal on the basis of this termination, who might be subject in the future to a reinstated order of removal. Therefore, whether or not these terminations were valid will ultimately determine whether or not that reinstated order of removal could be done. I think there may be others who could ... It could be somebody's found here who should have been removed or left, and the person's found here illegally, and it's charged with 8 U.S. Code Section 1325 or 26, and then this might be necessary to show that the presence is not lawful, correct? I believe so, Your Honor, and I think there may be adjustment of status things where the requisite time period is triggered and the delta between when parole would have expired and when it was terminated. I don't think there's likely to be formal mootness. Certainly no party has suggested as much, but I think as a practical matter, the numbers involved are going to be much smaller, I think, as a result of the Supreme Court stay, but I don't believe that it's likely that there will be formal mootness as a result of that stay. Let me ... Another area in there. Let's assume we were to find that parole termination has to be individual. Would the fact that the letters by email were sent to every person, because every person who's paroled has to have an email account. Everybody received those letters unless they don't check their email or change emails. Would that be sufficient individualized termination, and the letters say, I think it was 30 days. Would that in the government's position be individual terminations? Your Honor, I believe so, and I believe that's the thrust of plaintiff's position. They've taken the position that individual determinations are not reviewable, and hence, if it were that sort of individualized notice, I believe ... It's part of the strangeness, I think, of their jurisdictional argument that if you do something 500,000 times, it's not reviewable, but if you do it once, it suddenly becomes reviewable, but I think that's the necessary implication of plaintiff's argument that they say that the individual ones are not reviewable. So if the secretary does such notices and could take the position that the notices provided through existing accounts satisfies it, I think that could be the individualized determination, and I don't see how that would be reviewable. Let me ask you. If it were reviewable, or let's assume ... Again, here, nobody's asking for a due process hearing. What else could the government do to do individual terminations, because again, it's not a due process claim. It's simply just notifying the person of their termination.  So there is no due process argument at issue, and I think that there is ... This case before us. Well, and I think there is ... Again, it suggests that there would be no such, because you have to be admitted into the United States in order to get rights beyond what Congress has provided you. Just for anybody who's listening, when you're paroled, you're, in theory, in the United States, but you're not admitted to the United States. You get granted that parole status. That's correct, Your Honor. It's the entry fiction that is at the heart of immigration, that unless you're admitted to the United States, immigration law treats you as if you're at the border. Let me also ask, parole ... Well, when it's granted, it's for urgent humanitarian reasons or significant public benefit. I read the brief filed by the Amicus States, and their position is that, obviously, this is humanitarian, and also there's significant public benefit, employment within the communities. But also, my question to you is, do we look at that humanitarian in determining under the APA? If we could review, do we look at what the states characterize those humanitarian purposes, or we look at how Secretary Nuland understands and characterizes those purposes, which ... Both sides have different views of those humanitarian reasons or significant public benefit. Who prevails between those? Your Honor, Congress has given us the answer there, so assuming that neither of the jurisdictional bar applies, Congress has explicitly made the opinion of the Secretary the controlling one. We recognize that the states may have policy-based disagreements with the administration. They may have profound disagreements with it, but in this case, Congress has not just invested authority in the Secretary, it's made her own opinion to be the controlling standard for what decisions will be made. In that posture, it's a question for the political branches, and here, the Secretary, as to how she wants to proceed. Tomorrow, or I don't mean tomorrow, but let's assume at the end of this term, or if she were to resign and another Secretary come in, the new Secretary could say, we're coming back with the parole, and that's ... The statute does allow that, or the circumstances change. Let's assume there's a civil war in Nicaragua tomorrow. She could say, well, yeah, we're going to take all these individuals that can be paroled again. That can happen also.  Your Honor, this is something that's committed to the political branches, with the slight caveat that one of the political branches here, Congress, has enacted the Lake and Riley Act so that the grants of parole would potentially be judicially reviewable now in a way that they weren't a year ago. Can I just quickly turn to something I was a little confused about in your briefing? This is on your argument that the parole statute doesn't permit categorical termination. You speak about the previous administration's parole grants as being categorical. Does your argument depend on that? It doesn't, Your Honor. Certainly, the Secretary potentially could have taken the position that because the prior programs were unlawful, that's a basis to unwind them, but that was not a rationale that was supplied in the rule, and it's not a rationale that we are presenting to this court. We do, other than to note the strange contortions that are required for, there's a strangeness to where the grants, these categorical grants, are somehow immune from judicial review, but when you try to unwind them, they become reviewable. If we found that the grants here were made on a case-by-case basis under a categorical criteria, you'd still argue that the statute itself permits termination. Absolutely, Your Honor. It is not a rationale of the terminations that the prior ones were unlawful. Instead, there are a variety of rationales offered, including that the immigration-based benefits that the prior administration thought would accrue to their actions did not, in fact, occur and were not going to occur in the future. Okay. Any further questions? Okay. You have four minutes for rebuttal. Thank you. Thank you, Your Honors. Yes. So, you're going to have an extra 15 minutes if you need them. Would Counsel for the Appellees please introduce himself on the record to begin? Good afternoon, Your Honors, and may it please the Court, Justin Cox for the Plaintiffs' Appellees. You might want to adjust the microphone. Thank you, Your Honor. And if you could start by answering the question I first asked opposing counsel, whether just to, for the record, to have clear, your claims are purely statutory construction claims, no constitutional. You're not raising a due process claim? We are not. There is no due process claim presently before the Court. We have a due process claim that summary judgment. We have a motion for partial... Okay, but not before us. That's right. But it's also not the case that we have a pure statutory interpretation question. We have arbitrary and capricious claims which depend on... APA review. You have APA review and, of course, combined with statutory construction. You would agree to that, correct? Yes, Your Honor. Those are the claims. There are no constitutional claims presently before the Court. Yes, Your Honor. Okay. Thirty-five minutes to start running now. Okay. So jumping right into it, I'll start with jurisdiction. So to begin, it is, Mr. Ensign is incorrect when he suggests that 1252A2B2, that it turns on the nature of the authority at issue. That is directly contrary to BOERFA and KUKANA and Biden v. Texas, for that matter. In BOERFA, they made clear that you have to read, and KUKANA for that matter, you have to read the statute precisely because immigration law is replete with both mandatory limits and threshold requirements and also some discretionary authority. So the parole statute makes, at most, two decisions discretionary. It says that the Justice Secretary may, in her discretion, parole an individual. And then it states that when, it says what happens when the Secretary has determined, in her opinion, that the purposes of parole have been served. But other than those two discretionary decisions, it has, depending on how you count, something like a dozen limits, statutory limits on the authority. The authority has to be exercised on a case-by-case. I think I'm a little confused. So does your jurisdictional argument rest on the fact that the Secretary didn't make case-by-case determinations or that she didn't determine when the purposes of parole have been served? Those are both sufficient reasons, but neither is necessary. And to be clear, it is also not unusual at all for a court to conclude that, look to the merits in order to determine that a jurisdictional bar applies or not. The Supreme Court did that in 2001 in Zadvitus when it explicitly rejected the precise statutory provision that is being relied upon here on the grounds that what was at issue was the scope of the statutory authority. And that, the court said, is never discretionary. And so, of course, the court can determine, can reach that question. And similarly, similarly in, excuse me, in Kukana, the court, Borfa and Kukana were both unanimous decisions that emphasized above all that you have to get granular and precise when you're talking about the attempts to withdraw the jurisdiction of the courts because you start with the presumption that agency action is reviewable and you need clear and convincing evidence in order to conclude otherwise. Even if there are reasonably, reasonable differences of opinion regarding how to interpret the statute, that... You would agree that the Regents of University of California case would allow, that President would allow us to review here in this case? Regents is indistinguishable from this present case. Contrary to what my opposing counsel stated, Regents did not hold that anything was unreviewable. Regents merely, it took for granted the conclusion of Attorney General Sessions at the time that DACA was unlawful. And it said, that's not the end of the inquiry. We're not going to review that because we don't need to. Because the secretary in that case did not understand the scope of her discretion not withstanding that conclusion. And in that case, the secretary, there was no revocation of authorized grants of deferred action. And in fact, there was an additional renewal period that was offered to individuals. If their deferred action was going to expire within six months, they could renew for another two years. And the court said, nonetheless, you have to consider alternatives that are within the gambit, which in here they said, there are two pillars of DACA. One is the forbearance policy. One was the, was providing of benefits and secretary didn't consider simply doing the one and not the other. And she should have. And so it was arbitrary and capricious. And additionally, she failed to consider the reliance interests. And there, the reliance interests are, cannot be distinguished. Individuals, members of the class moved to another country and because they were told they could do so if they went through this process. And once they got here, they could apply for other forms of relief. They, of course, were told just as deferred action recipients were told that this can be ended at any time. And the Supreme Court rejected there to the argument that that was somehow dispositive. And they said, absolutely not. You have to take into account that legitimate reliance interests, even though DACA had been in place for five years when when secretary Duke came in and sought to end it. And because the secretary had failed to consider those two important issues, I said it was arbitrary and capricious, even assuming DACA was unlawful. And so it's indistinguishable. And it's also worth noting that the government argued in Regents that there was no law to apply, that 5 U.S.C. 70182 precluded review because there was no way to tell whether or not Secretary Duke's decision was an abuse of discretion because deferred action was not statutory nor regulatory at the time. And so how do you measure it? And the court had no trouble rejecting that argument and then applying traditional arbitrary and capricious review. And the I can I can continue with with jurisdiction if if that would be helpful. A couple of other. Let me let me move you to more to the merits. So one of the arguments the government made here today was that given what we're dealing with here, humanitarian parole, a categorical reason might support termination for a group of people, say a civil war in a country has ended. And that that that argument supports, you know, supports their merits arguments here. That seems to have made some sense to me. How do you respond to that? At least two responses, your honor. First, even assuming that it was permissible sometimes to to rely on categorical determinations to terminate parole. That's not what the secretary did here. If you if we look at what the secretary actually did. So I'm looking at page 46 of the addendum. And of course, it's a basic principle of administrative law that if the secretary's decision is to be upheld, it has to be based on the four corners of this explanation. And on 46 in Section 3rd, she secretary acknowledges that in when each of the parole processes were created, DHS said that they would serve both of the two statutory purposes of the parole statute. They would provide significant public benefits and serve urgent humanitarian reasons or address the emergent urgent humanitarian reasons in the four countries. And and in Section 3 of each of the FRNs that create the parole processes, it says justification for justification for the processes. Subsection A, significant public benefit. It has six, six significant public benefits that it would serve. Secretary Noem ticks through those right here in addendum 46. And then in each of the FRNs creating the processes, there's a subsection B. So the urgent humanitarian reasons and it explains the country's specific urgent humanitarian reasons for the parole processes. That is those reasons are wholly absent from the explanation that Secretary Noem gave. The statute provides urgent for urgent humanitarian reasons or significant public benefit. And doesn't she address the significant public benefit to the United States? Yes, Your Honor, but the processes were justified on both grounds independently, and she only addresses one. You say I didn't see anything in the language of the secretary's description that supports the suggestion that each of those purposes or benefits was by itself sufficient. She seems to have said to the contrary that it was necessary. So as I understood the government's argument, they're saying a necessary purpose of this program was to relieve congestion at the border. Times have changed and the new secretary has determined that that purpose is served by other means, and therefore the purposes of such parole shall, in the opinion of the government, be assessed on that basis because that purpose was no longer satisfied. The secretary said if that was a necessary condition of the parole, then there's no need to look at whether the other necessary but not sufficient conditions were also satisfied. That is not my understanding of what the government has argued to date, Your Honor, and that's also not what Secretary Noem said. Can you point to the language in what Secretary Noem says that would suggest that the purpose of relieving congestion at the border was not a necessary condition? Well, so to be clear, there were six bases for the significant public benefits in the original creation of the processes, and Secretary Noem addresses those and gives her view that considering those six items, and she ticks through them in Addendum 46-51. She goes through them one by one. Her Item 4 actually includes three, and that's why she addresses all six, but there was a separate independent basis for each of the grants of parole and the processes themselves as established, and this has not been disputed. She acknowledges it herself in Addendum 46 that DHS stated that they would provide both of these. They would both serve urgent human sharing reasons and provide significant public benefits. Yes, but after listing them, she then listed the reasons for the termination, and then she said, I quote, these reasons independently and cumulatively support termination. Yes, Your Honor, but the sentence before that is her solitary explanation of why she no longer believes the urgent humanitarian prong of the statute justifies the programs, and she says, and I quote, regarding previous arguments or determinations that these programs were consistent with the requirement of urgent humanitarian reasons for granting parole, DHS believes that consideration of any urgent humanitarian reasons for granting parole is best addressed on a case-by-case basis. Yes, but you're just reading her litany of reasons. No, Your Honor. What I'm saying is this says nothing. Well, she does. I'm looking at the beginning, the rationale for initial implementation where she identifies the reasons. She lists a number. One of them is the programs that she finds does not serve a significant public benefit and is not necessary to reduce levels of illegal immigration. She then lists the humanitarian reasons, but she then says those reasons independently support termination. How do you get around that? Well, Your Honor, she doesn't list any of the humanitarian reasons. Well, she did. She listed the public benefit of reducing levels of illegal immigration. Yes, Your Honor. She addressed one of the two prongs. And she says that is independent grounds for the termination. Your Honor, even if one were to take this as meeting the statutory standard, there's no question that she has an obligation under Encina Motorcars and Fox Televisions to acknowledge the facts and circumstances underlying the prior decision when we're sending a policy. And so she needed to address the urgent humanitarian reasons that were an independent justification. If you have two reasons for doing something, reason A and reason B, and both are necessary, you wouldn't do it without both of them. Once you determine reason A is no longer applicable, why do you need to look at reason B? I think the disagreement, Your Honor, is that there's no evidence to suggest that both were necessary. What do you understand she meant by the word independent when describing the first reason A? I see the statement where she's saying these reasons, but she's incorporating a prior discussion. And the sentence right before is an entirely circular sentence that is crafted to say nothing at all. It doesn't say that she disagrees with the prior determinations regarding urgent humanitarian reasons. She doesn't say what they were. She merely says that DHS believes that they should be met or they can be addressed through the case-by-case basis. Now you're talking about reason B. But my question to you, and I'm trying to think this through, this is tricky stuff. But it seems to me if she's saying that reasons A and B are necessary and reason A, she clearly says, is no longer being served, what's the counter-argument to that? Help me understand that. I think the counter-argument, Your Honor, is that Secretary Noem doesn't get to decide what was necessary with regards to the prior decision. She doesn't get to recast that decision and say Secretary Mayorkas said both of these were required. So what's your evidence, and let's go outside of what the Secretary has said here. What evidence is there in the record that you can point us to that would show that this parole program would still have been done but for the desire to reduce congestion at the border? Well, Your Honor, I don't think that's the – in our view, the standard is you evaluate what the reasons that the agency gave. So we don't have to prove the negative. We don't have to prove that somehow the Secretary Noem would have reached a different decision. The only question before us is what did she say about the independent basis that her agency previously gave for establishing these processes? And she has said nothing. Well, she says actually overall DHS stated that the programs would provide significant public benefit for the United States and, not or, and address the urgent humanitarian reasons underlying high levels. And with respect to the significant public benefit, she then wrote enhance border security, reduce congestion, minimize domestic impact, et cetera. How can you say she said nothing about the reasons when – Because all of those reasons have to do solely with the significant public benefits. And the statute authorizes parole under either, one or the other. Now you're saying A and B aren't both necessary. I don't believe we've ever said A and B are necessary. Secretary Menorca said that the processes were justified by both. And as a matter of law, either is sufficient. And where – show me where she says that either is sufficient, having said independently the lack of any one is decisive. Well, I don't see where she says that, Your Honor. Well, she says the reasons independently support termination, independently. I mean, perhaps if she had said that that – this is not an argument that defendants have made previously, and so it's not one that we've – that we have briefed. But the Secretary said in the same – earlier in that same section, she acknowledges that they had two statutory bases. And so she could have said neither of these are sufficient. But even if she had – even if she had said both are necessary, and I disagree, she still needed to address the facts and circumstances underlying the prior determination of Secretary Menorca. And she didn't – she didn't do that. She didn't even acknowledge she was changing the court. Let's assume we agree with you. Wouldn't that sort of bind any future Secretary from taking action? Because the Secretary could explain in such detail that the new Secretary, there's no way to undo that. And I don't think that's what the immigration – what the parole statute wants. No, Your Honor. And actually, it's not a particular – we agree that the statute does not require some kind of exegesis in order to roll back your predecessor's policy decisions. But you have to – the agency has to at least acknowledge that it is changing policy. And this one sentence that says regarding the prior determinations, we believe we should just proceed case by case, well, that's what the agency said it was doing before. And so it's a circular – it doesn't acknowledge any change in policy whatsoever regarding the urgent humanitarian reasons. And to be clear, there's nothing else in the FRN that discusses the urgent humanitarian reasons. And that's the only two other things that defendants have ever cited is on page 53 of the addendum is footnote 70, and it merely incorporates a prior discussion that doesn't exist and says, as explained throughout, and then it lists, again, significant public benefit reasons, no urgent humanitarian reasons. And then the last thing is on the very next page in the constructive notice section, in the middle column at the top, the first sentence, she recites the regulatory standard for terminating parole on 8 CFR 212.5E2, and she says, for the reasons set forth above, which again, there aren't any reasons set forth above regarding urgent humanitarian reasons. And because the statute makes them independently sufficient, she needed to address both of them. Okay. Go ahead. Could you help us on with how we have this unusual situation where we have the U.S. Supreme Court order in a case with no explanation as to what the rationale for the order is, and in another case of a similar situation, there's a suggestion that those orders are not binding but can provide guidance. So I look back to the order in this case and say, what, if any, guidance can we find in it? There's none that's expressed except the bottom line. So I think, well, what possible reasons could there be for the court's decision? And I can only think of three. One, that they felt that you're at the short end of the stick on the likelihood of success on the merits. The other is that the equities weigh very heavily in favor of the government. Or the third is some combination of the two. Under all three of those reasons that I can think of for the court order, it seems to cut against your client's position. So am I missing a reason, or is there something in this record that's different than what was before the Supreme Court? So that would reduce the ability of the Supreme Court's order to provide guidance. On the last point, Your Honor, I would say there is something different, which is defendants told the Supreme Court that there was no case-by-case consideration of grants of parole under the CHNB processes. They stated that all the grants were made categorically, and they explicitly said there was no case-by-case consideration. They don't stand by that anymore. That's one reason. There are three other reasons to not, in our view, to not defer to the Supreme Court's  One is they gave no reasons, and therefore they've chosen not to do so. They could have, and therefore this court would be speculating as to the reasons. So it's not precedential. It's not even law of the case, and it can't be persuasive either because they didn't give any reasons. Then that's unlike the case that the defendants recently put the 28-J letter in on. The court in the prior case had issued an opinion, a couple pages, gave its reasons, and then when the second case came up on an indistinguishable posture, they said, hey, we told you how this all shakes out. They didn't do that here, and so this court would be speculating if it sought to assign a particular meaning to it, and the last thing I'll add is that the Supreme Court, the order in this case, it self-contemplated that this appeal would proceed in the ordinary course. So I hear you saying two things in response to my question, I think. I hear you saying we shouldn't engage in the process of trying to figure out why they did what they did, and then secondly, you suggested a fourth reason, which is they were misled on one of those other three reasons by the government. Are there other reasons that we should not find guidance in the Supreme Court order? That's something we obviously pay a lot of attention to. I think I don't have anything additional, Your Honor, other than their decision not to provide reasoning. Let me ask you one other question. When you look at the parole statute, the way that I see it, under the last administration, the four countries that are issued here were determined categorically, and once that's done, then individuals from those four countries, and again, under this program, only those four countries, apply, and if they qualify, then they're paroled. Now, my question is, when it's categorically terminated, isn't it the country that, well, Secretary Nuland will determine these four countries no longer categorically apply for parole, and if that is so, then there's no more parole. Individually, you lose your parole, but again, to get parole, you have to do it individualized, but it's a country decision. Before any decision as to any person is made, there has to be a decision made as to any country. Doesn't that affect the reading of the statute one way or another? Well, I think as a general matter, the Secretary probably could engage in or give categorical reasoning with regards to the prospective availability of the guidance, which is used when adjudicators consider the individual case by- You're saying that this could be prospective, but it couldn't be retroactive to those persons already in parole? Well, I think prospectively, the parole statute does not constrain the Secretary's ability to discontinue the guidance that was in the Federal Register notices that the individual grants of parole relied upon, but no one was given parole on the basis of those categorical determinations. It was merely guidance that made a particular application process. But you have to be pre-qualified. For example, if somebody, let's say from country Z, it's not one of those four countries, asked for parole under these programs, that person would not qualify automatically. It's only the person from these four countries. They would not be able to apply through these processes. They could apply for parole, but they wouldn't get the benefit of the guidance that came with this. And to be clear, if you look at the form 134A, which is referenced a dozen times in Secretary Noem's decision, it tells the applicants, you have to provide a case-by-case reason. It says that granted parole is discretionary. It's granted on a case-by-case basis. Even if somebody whose parole has been terminated pursuant to the letter wants to ask for parole because some people could still qualify, it's individual case-by-case basis. Just like it was under the CHNB parole processes, yes. But without the benefit of the guidance, they'd also have to pay another $600 application fee, and they would never get a decision. Let me also ask, and let's go to statutory interpretation, which we were discussing with your opposing counsel. Would you agree or disagree that the rule of lenity in construing a statute would not apply to a civil statute such as this? The concept is slightly different in the immigration context, but there is, in fact, a rule of, it's not called the rule of lenity, but it's essentially a rule that gives, where the quote-unquote alien is supposed to get the benefit of ambiguities when it comes to immigration statutes. If that is a thing, we're happy to put a 28-day leniency on that. We're talking about ambiguity, and the case law from our circuit, and I believe the Supreme Court as well, suggest that when in one part of the statute you use, for example, here individually, and then within that same paragraph for termination you don't use individually, you should not extend that to the other part. What would you have to say about that? Well, I would say a couple of things, Your Honor. That's the Russello case I'm referring to, and we have some circuit cases. Yes, Your Honor. As a matter of fact, some have to do with immigration matters also. So our first response, Your Honor, is that it, as we were discussing earlier, it doesn't matter because the Secretary never actually made the determination that the urgent humanitarian bases for parole have been served. There is no, there's nothing in the Federal Register Notice that says that other than the boilerplate recitation of the legal standard and then a reference to a discussion that doesn't exist. So that's our first position, is that this appeal does not present that question. And then you can go back, but let's assume we were to agree with you right now and tomorrow Secretary Nuland does exactly what you're saying she didn't do. Yes, Your Honor. She could terminate the whole program and send everybody back to their countries? Well, those are quite different decisions. Could she mass terminate parole? Is that the question? If she were to, if she were to, you know, because you're saying to Judge Cagata's question, she only addressed one of the two issues. The judge disagreed with you, but let's assume we were to agree with you. She goes tomorrow, publishes Federal Register, says, you know, amends her reasons and prospectively in mass parole terminations. Of course, her decision. She could do that. Substantively, yes. Or even while we're deciding the case, she could tomorrow say, well, just in case, let's go ahead and do it this way also. If she sufficiently addressed the urgent humanitarian reasons of the individual grants of parole, she can do that. I think that there would, but the individual grants of parole were not made through a Federal Register notice. And therefore, she couldn't simply look at the prior Federal Register notice and say, you know, all of the grants of parole that have happened in the ensuing years on a case by case basis by hundreds, if not thousands of different CBP officers, that the purposes of those parole had been served. Can I just circle back to, I think the question Judge Halpy was asking two questions ago, and maybe focus you a little bit more. Based on the statutory text in 1182, what is your best statutory interpretation argument that that statute doesn't permit categorical terminations like we see here? So the, yes, Your Honor. So a couple of things. One that we haven't touched on yet is that the statute requires that conditions of parole be prescribed on a case by case basis. And the, and here what the Secretary did was to change the conditions of parole of approximately 430,000 people we now know from the administrative record. The defendants say that's not what she did. What she did was end parole. This is their response in the reply brief and a footnote. But it could be both. Like there's no, it can, she could both have changed the conditions of their parole on MAS and change the, you know, as one of those changes, change the expiration date so that it ends in 30 days, which is what she did. So that is one way that she violated the statutory requirement to prescribe conditions on a case by case basis. Beyond that, I think the, as Judge Stelwane discussed at some length, the statute indicates, all indications are that it is to be exercised on a case by case basis. The, and there are, and most of the limits around it are, are ones that can be. Aren't the letters that are sent to every individual individually because they're getting these through their emails. Isn't that individual termination? No, Your Honor, for a couple of reasons. One, there's no record evidence that those were ever sent. The only thing that the government can cite is the Federal Register Notice itself, which of course predated when they said they were going to send the letters. And the evidence in the record is that they're quite bad at sending these letters. As we cited in March, April, the government was sending native born U.S. citizens notices that it was time for them to leave the United States because their parole had been terminated. And so we can't merely assume that any of these have been sent. Second, the regulation that the Secretary cites to justify sending these electronic notices only applies when the, when the non-citizen is represented by an attorney. And you didn't need an attorney to apply for parole through the CHNB processes. She asserts in the constructive notice section that she was going to rely on it, but never acknowledges that limitation on, in the regulation. And what's more, the regulation, a separate regulation on the termination of parole requires that in order to terminate someone's parole, you have to give written notice to that person. And the, there's the statutes, the INA does require non-citizens to keep their mailing address up to date. In fact, it's a criminal violation if you don't. And that's why typically in any circumstances, the DHS will at least mail notice. And in order to put someone in removal proceedings, you have to either provide them with personal service or mailed service anyway. And so the Delta here is just, uh, apparently in an intent. Isn't removal a little different from terminating the parole? Yes, Your Honor. But the Secretary said that she's trying, she wants to remove people here, but what she's, uh, what she's doing to do that, she has to give them personal or mailed notice. And so, and so it's not, if she has to do that anyway, that the thing that she's trying to do instead is to terminate their parole so that they can't work. And she'll try to force them to leave the country, um, without having to go through removal. What if tomorrow she were to decide, okay, let's have our immigration agents find these 430,000 individuals and here are the letters. Would that suffice? Uh, I, I'm not sure, Your Honor. Biden v. Texas is clear that any exercise of the parole authority has to be reasonable and reasonably explained. Um, and that case was, this is the 2022 case regarding MPP. Yeah. Okay. So let's assume that these letters are in both in English and the native language, both these, these four groups of individuals, uh, they, even a five-year-old could understand what the letter says. And let's say the letter tomorrow says, you know, you have 30 days now. And from the moment you've been served, would that suffice? I get, if the question is, does the secretary have the substantive authority to end parole? She certainly does. Just as though, just as the secretary had the authority to end DACA, um, writ large and as to each individual. How would you propose that she terminate parole or, or would you, are you saying that she can't terminate this parole under any circumstance? What I'm saying is under the APA, we evaluate the reasons that she gave and the reasons she gave in the process that she went through was not sufficient. Can I just circle back to my statutory interpretation argument, which I didn't really hear your answer, um, unless it was that the district court got it right. That, um, the singular that's used at the end of the relevant paragraph here suggests that the case by case should carry through the whole. I think that that's, that was one reason. Another reason is in order to determine that the purposes of someone's parole have been served, you have to at least know what the purposes of those, of the parole was. And so again, even if categorically the secretary could theoretically address the urgent humanitarian bases for the processes generally and the individual grants of parole, that's not what she did here. And so it's not, this panel doesn't have to reach the question of does the, does the statute require a case by case for termination? Because that's not even what she purported to, she didn't even do it categorically. If I may accept a couple of responses. Just continue, there may be some more questions. So I wanted to address the 1996 amendments. We have substantial record evidence that, uh, that, that INS understood well before 96 that the case, that the parole authority had to be exercised case by case. And the 1996 amendments did not simply insert the words case by case. It actually, the statute, uh, in IHRA, IHRA had four different sections that had impacts on parole. And, and none of them, it's simply not the case that, uh, it would somehow be superfluous. And there's no evidence that the, uh, that the executive thought that it could act categorically prior to 1996 either. And the, the Lake and Riley amendments also don't carry the weight that, uh, that closing counsel has suggested. It had, in fact, Lake and Riley has nothing to do with reviewability at all. It's about standing. And it's, it was enacted because a number of states have sued, uh, unsuccessfully in recent years to challenge parole policies. And so section three of Lake and Riley added language, much like subsection C now in the parole authority to the parole statute and four other statutes, each of them corresponding to losses, uh, at, at various courts, uh, by states. And so, but all the, it's standing, it's not reviewability at all. And if anything, it indicates that Congress intended and knew that these decisions were reviewable because they didn't enact a cause of action. Um, they didn't, they didn't adjust any sort of jurisdictional bar. Instead, they said that states shall have standing in these circumstances. Uh, and so that supports us rather than, than undermines any suggestion that, um, that these decisions are reviewable. And then, um, I also want to answer the quick question, quickly the question of how these programs ended in the past. Typically parolees have, uh, have been able to adjust into permanent status, either through existing authorities or, um, quite commonly Congress has enacted legislation giving them a pass. This is, this is discussed in the Cato amicus brief and also in the record, we have a list of the 125 or so, um, prior categorical parole processes, along with, uh, citations to the statutes where Congress, uh, gave a path to lawful permanent residence for the parolees. That's typically how it's done. But this particular statute did not provide that path. Congress has not enacted a... When this statute was passed during the Biden administration, that could have been done. Could have been said if after X number, you know, or X period, you know, the, you know, this path, these individuals were paroled can take this path. This statute does not allow it as it's written right now. Previously, the parole statute didn't provide for it either. It was either existing authorities. For example, about half of our class members as of March 9th had, uh, pending applications for other forms of immigration relief. Uh, and so it's often it's that kind of relief or Congress enacts a new, uh, a new statute not related to parole, but simply said not related to the parole authority. But that says individuals who are paroled in through these particular processes, uh, can adjust status. Okay. But here for that particular statute that is lacking right now, uh, Congress could tomorrow or, you know, future do it. Yes, your honor. Let me also, since you mentioned, you said that about half of your, uh, parolee clients, uh, have some alternative, perhaps relief. Can you clarify that a little bit or explain a little more? Sure. So, uh, as they were told when they come in, they could apply for asylum or adjustment of status or temporary protected status. Let's assume the parole is terminated. Those who have applied for asylum or some other form of relief, they could, if those processes are still ongoing, they, they, they, they could remain in the country or they have an appeal pending administratively for asylum or whatever. Well, well, actually in January, uh, your honor, the, as soon as the new administration came in, they suspended the adjudication of any benefit application that was filed by any of the class members. Uh, that was recently stayed by just the one that was a notice of appeal that was filed yesterday on the 60th day, um, after the decision, uh, and that. So the administration actually, their, their intent was to preclude the class members from getting relief. And many of the forms of relief that they, the applications that they have pending cannot be raised in expedited removal. In fact, none of them can, even if you have an asylum claim, if you are put into expedited removal, you have to convince. So in other practical terms, we're back to the 430,000, the number because out of that number, there's not a subgroup that has right now, any practical remedial, uh, you know, alternative. Uh, so certainly members of the class are pursuing those who have stayed. Some have left voluntarily. Some, uh, no, some don't even know that they have had their parole terminated. Um, but they're certainly pursuing those forms of relief, but, uh, the practical avenues available to them right now are quite narrow. Um, and you know, as, as we've pointed out, secretary Noem never doesn't even acknowledge the contemporaneous action of her agency to suspend the adjudication of their benefits applications. Um, the whole point is to just push them out, but they've, uh, you have to at least go through the appropriate process. Let me just one other question. I think this would be my last brother. Colleagues will may have some other questions. Let's assume we were to determine or to hold that determination of parole has to be on a case by case basis. How are you exactly proposing, uh, that this has to be? Because there, there would have to be, of course, a letter served personally. I believe you already said that, but what would have to happen after that? Are they entitled individually to a hearing, to other review? And again, all of this also in light of the, the APA, the Administrative Procedure Direct. So what more else does the government have to do if, if it's individual and they're all served with their letters? And their letters can be understood by a three-year-old. I think we're speculating about a potential action of the secretary. We, uh, we don't think that that's, we don't think that that's particularly relevant to what she did here. And we understand that it, it might, that that question might arise later, but she fell so far short of what's required by the APA here that it's, uh, the court doesn't even have to, uh, reach those questions. So for example, the reliance interest and alternatives, the only reason she gave for overriding reliance interest and rejecting the two alternatives that she considered was this expedited removal, her understanding of expedited removal. But defendants have now conceded, in fact, argued that that was in fact a contrived reason because she also thinks that she can, uh, put parolees through expedited removal forever under the, the other prong of expedited, of the expedited removal statute. And so their argument is that, that it was doing, the one reason she gave was doing no work. Uh, they've conceded it and essentially they're saying no prejudice, but to get there, they have to argue that the, the only reason that secretary Noem gave was contrived. But let's assume we were to rule in your favor on the APA grounds. Uh, the, there is no state. So the administration continues, uh, stretch out has mentioning to, to, to remove these individuals or terminate the paroles. Uh, while that case is pending, the case would be pending before the Supreme court, but couldn't the administration at the same time saying, even if we find that this, this violates the APA, they could go ahead and restart the whole process again and, and, and do it in a way that complies with what was not done here. Am I correct? So, uh, it wouldn't, they would not be prohibited from trying again. That's absolutely right. Just as in regents and with DACA, they could try again. And, but as DACA is still here, we're many years later because the administration chose not to try again last time. Um, and they haven't tried again yet here. And so I, I understand the point, but it, it, uh, the, uh, Supreme court and regents actually consider this too. They said, we understand requiring the agency to go through these procedural steps again, can seem a little, um, sort of self-defeating or unnecessarily burdensome because we all know they're going to get to the same place. But they rejected that argument, the precise argument that your honor is, is positing in the regents case. Uh, and, and so we understand what you're saying in terms of the mootness. I think the, the most recent grants of parole under the, uh, to a class member was probably in January. But a, let's assume a victory for your client in this case is perhaps a victory in Ron one out of 10 rounds. I don't know how many rounds. Yes. There would still be other rounds of action and litigation. I would assume it just takes you back. It takes you back to the status quo. Yes, your honor. That's right. Um, and, and we think that that's quite valuable at a minimum. It would let our, our clients and the class members have the dignity of, of living on their own terms, uh, as opposed to being subjected to the kinds of removal and detention processes that are happening right now. Okay. I have no further questions. If my colleagues have any, please go ahead. No, thank you. Okay. Thank you very much. Thank you counsel. Once we have four minutes of rebuttal, please reintroduce yourself on the record to begin, sir. Drew Ensign, uh, deputy assistant attorney general for the United States. I'd like to make five quick points in rebuttal. Um, first the particular bar of title eight on judicial review here very much does turn on the nature of action. Judicial review bars come in many different flavors and, and species. Here it says that the bar applies when quote, the authority for which is specified to be in the discretion of the secretary of Homeland Security. And so it very much does turn on the nature of the action here, which is discretionary. There are other judicial, uh, uh, bar judicial review that turn on the specific decision of issue here. This is not one of them. This is something that turns on the nature of the action and then the nature of the authority. The authority here is discretionary in nature and therefore it applies. Second, I, I, I have not heard any real wrestling with the language of it's the opinion of the secretary. Um, the opposing counsel relied on the Buarfa case, but that and Webster make very clear that when Congress sets the standard for something is not some sort of objective standard, but rather the subjective judgment of the government official at, at issue, they are the CIA director and Webster, uh, Homeland Security director, or sorry, Homeland Security secretary in Buarfa. When it turns on their subjective judgment, that is committed to agency discretion and under Webster and Buarfa that's controlling here and it bars plaintiff's APA claims. Um, third, there was no evidence presented that the prior grants under the CHNV program were, would stand alone based on humanitarian grounds rather than humanitarian and other grounds that the secretary in, you know, in the language Judge Kayada identified, made clear individually and cumulatively that they were both required to do so. Mr. Cox's argument was that you have never made that particular argument in the course of this litigation. Your Honor, I think we have, I think the secretary disagreed with the way in which secretary Mayorkas approached it. He did it on a categorical basis, essentially putting an anvil on the scale for these four countries and secretary Noem disagreed with that and said that, no, we're going to return this to being case by case as the statute, the statutory language indicated. So I think the secretary in her opinion is allowed to disagree with her predecessor and say, instead of resolving these humanitarian things on the, on categorical basis, I, I find that's the inappropriate way to, to look at this and instead I'm going to return it to the sort of case by case analysis that, uh, that the statute provides. You know, I think, well, I think the argument, the argument turned on the assertion that the purpose, a purpose of this whole program was to relieve congestion at the border and that that was a necessary purpose to the program and therefore finding that that had been served justified termination. And I believe Mr. Cox's argument, at least in part, was that that particular argument has not been presented by the government. Your Honor, I disagree with that. I think we have presented that argument. We have made the argument that that prior basis that, uh, the secretary, the secretary identified was not, uh, was incorrect when issued and was certainly not correct going forward that those immigration benefits that secretary Mayorkas identified, um, did not in fact come to pass and were, uh, and in fact, therefore the fact that they didn't arise was a reason to terminate. And that's something, one of the many rationales that, that secretary Noem gave. You know, I think it's also telling too that the CHNB ones were time limited. If it, if you truly thought that it was humanitarian basis alone was sufficient to justify it and not public policy based, you would expect a termination that had something to do with the humanitarian circumstances rather than a time limit. The time limit very much suggests that public interest was a central part of that. Okay. Thank you, counsel. Uh, I just want to say I speak for myself, uh, but I want to commend both counsel for your thorough briefing, your preparation, and particularly for answering all our questions because it's something that in many arguments, counsel don't answer questions. Uh, and, uh, and as advocates, you have served represented zealously your respective clients and that is how our system, our legal system was intended to function. And we have seen that today in a civil proceeding. Uh, so thank you very much. And I also thank all the amici who have filed briefs also. And again, I speak just for myself right now. Thank you. Thank you, your honors. Counsel, that concludes argument in this.